[Cite as *In re T.J.*, 2024-Ohio-5914.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE T.J.                  :

                           :           Nos. 113815 and 113903

[Appeals by T.B., Mother

and K.J., Father]               :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 19, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD19910671

---

### *Appearances:*

Judith M. Kowalski, *for appellant* T.B.

Wegman Hessler Valore and Michael Gordillo, *for appellant* K.J.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} In this consolidated appeal, appellant-mother ("Mother") and appellant-father ("Father") appeal the decision of the Cuyahoga County Juvenile Court terminating their parental rights and awarding permanent custody of their

minor son, T.J., to the Cuyahoga County Division of Children and Family Services

("CCDCFS").  Mother raises the following three assignments of error for review:

> **Mother's Assignment of Error I:**  The Cuyahoga County Juvenile Court erred in finding that clear and convincing evidence supported granting permanent custody of the subject child to [CCDCFS].

> **Mother's Assignment of Error II:**  The decision to grant permanent custody was against the manifest weight of the evidence.

> **Mother's Assignment of Error III:**  The juvenile court erred in granting permanent custody as [CCDCFS] did not make reasonable efforts to reunify the family prior to seeking permanent custody.

Father raises the following six assignments of error for review:

> **Father's Assignment of Error I:**  The trial court's decision to grant emergency custody of T.J. to CCDCFS and remove him from [Father's] care was not supported by sufficient evidence.

> **Father's Assignment of Error II:**  The trial court's decision to grant emergency custody of T.J. to CCDCFS and remove him from [Father's] care was against the manifest weight of the evidence.

> **Father's Assignment of Error III:**  The trial court's decision to terminate [Father]'s parental rights and to award permanent custody of T.J. to CCDCFS was not supported by sufficient evidence.

> **Father's Assignment of Error IV:**  The trial court's decision to terminate [Father]'s parental rights to award permanent custody of T.J. to CCDCFS was against the manifest weight of the evidence.

> **Father's Assignment of Error V:**  The trial court erred by terminating [Father]'s parental rights and awarding permanent custody of T.J. to CCDCFS where CCDCFS had failed to make reasonable efforts to reunify the family.

> **Father's Assignment of Error VI:**  [Father] was denied effective assistance of counsel.

{¶ 2}    For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 3} In September 2019, CCDCFS filed an amended complaint, alleging that T.J., who was four years old at the time, was abused and neglected, and requesting a dispositional order of temporary custody to CCDCFS.[1] The crux of the complaint was that the alleged father of T.J.'s half-siblings allegedly hit T.J.'s half-brother in his stomach, ribs, face, and shoulder, which required medical attention; the half-siblings' alleged father was arrested and incarcerated as a result of the incident; Mother was also arrested and was incarcerated as a result of unresolved criminal matters; and Father's whereabouts were unknown.

{¶ 4} The court granted predispositional temporary custody to CCDCFS on September 4, 2019. The court held an adjudicatory hearing followed by a dispositional hearing on December 2, 2019. Both Mother and Father admitted the allegations of the complaint, as amended, at the adjudicatory hearing, and T.J. was adjudicated neglected.[2] At the conclusion of the dispositional hearing, the court found that T.J. could not be safely placed in Mother's home, placed T.J. in the temporary custody of Father, and terminated the court's previous order placing T.J. in the temporary custody of CCDCFS.

---

[1] The complaint was "amended only by virtue of the fact [that] apparently the first one was not signed by the attorney and filed, but [the amended] one is signed, both the motion and the Complaint, by [the attorney.]" (Tr. 5.)

[2] The complaint, as amended, alleged that Father of T.J. "is ready and willing to provide for his child" and "Mother is in counseling to help resolve her subst. abuse." (Amended complaint, Oct. 4, 2019.)

{¶ 5} Thereafter, the matter was set for a hearing on CCDCFS's motion to terminate CCDCFS's temporary supervision on May 12, 2022. The matter was continued because of a sexual abuse referral to CCDCFS and because CCDCFS was looking into a different permanency option.[3] At the time of this hearing, CCDCFS received three other similar referrals, which were unsubstantiated. The matter was then continued to July 25, 2022. In the interim, on July 12, 2022, Mother filed a pro se motion for immediate removal, alleging that Father was mentally and emotionally abusing T.J.

{¶ 6} At the outset of the July 25 hearing, Father's counsel asked for a continuance because she was recently appointed and Father was ill with COVID-like symptoms. CCDCFS also asked for a continuance because it had three motions before the court (legal custody motion to Father, motion to terminate protective supervision, and motion to suspend Mother's visits) because the outcome of CCDCFS's investigation into the latest referral would weigh heavily upon its recommendation for permanency. Mother's counsel opposed the motion, arguing that Mother's visits should not be suspended, and that Father typically, with each allegation of sex abuse that he made, arbitrarily stops visitations with Mother without any court order, without notifying T.J.'s guardian ad litem ("GAL"), without notifying CCDCFS, and without notifying Mother. Mother's counsel requested that CCDCFS take custody of T.J. and place him with Mother and if not, foster care. The

---

[3] The sexual abuse referrals stemmed from allegations that T.J.'s older half-brother, who is approximately seven years older than T.J. and lives with Mother, sexually abused T.J.

court granted the motion to continue with regard to CCDCFS's motion, but decided to proceed with a hearing on custody.

{¶ 7} Following the conclusion of the hearing on this motion, the court found that "[t]he Motion for Pre-Dispositional Temporary Custody is denied as to [M]other but granted to [CCDCFS]" and further found that T.J.'s "continued residence in or return to the home of [Father] will be contrary to the child's best interest." (Order, July 25, 2022.) The court placed T.J. in "the emergency temporary care and custody of [CCDCFS] pending further hearing." (Order, July 25, 2022.) In support of its decision, the court noted, among other things, that T.J. is medically fragile, has not been in school for two years, is unreasonably isolated from family and friends by Father, Father may be inappropriately influencing T.J., Father had dangerous lead in his home; and a temporary break in placement is in T.J.'s best interests. CCDCFS's and Father's counsel filed a joint motion for stay of execution of the magistrate's order pending the filing of a motion to set aside. This motion was denied by the trial court on August 1, 2022.

{¶ 8} In September 2022, CCDCFS filed a motion to modify temporary custody to permanent custody. The trial on this motion was held on five separate dates beginning in June 2023 and concluding in February 2024.[4] The following is a summary of evidence that was presented in the matter over the course of the five trial dates.

---

[4] Also before the court was Father's motion to return T.J. to him.

{¶ 9} Extended Service Worker Alease Chisholm ("Chisholm") testified that T.J. was removed from Mother's care and placed in CCDCFS custody in September 2019. T.J. was then placed in the temporary custody of Father in January 2020. A case plan was developed and implemented for both Mother and Father to promote the permanency plan of reunification. Mother was referred to substance abuse, mental health, and domestic-violence services and successfully completed those case-plan objectives, as well as resolving her housing issue. Father was required to complete a mental health evaluation, bond with T.J., and provide for T.J.'s basic needs. In July 2022, T.J. was removed from Father and placed in CCDCFS custody because the court was concerned with T.J.'s medical fragility and Father's possible COVID infection, T.J.'s educational situation, T.J.'s isolation from others, Father's interference with Mother's visitation, and unremedied lead exposure in Father's home. CCDCFS moved for permanent custody in September 2022.

{¶ 10} Chisholm testified that at the time of trial, T.J. was in remission from leukemia and was taking medication for that condition. When T.J. was removed from Father's care and placed in agency custody, Father "refused to provide the medications that [were] sent to his home for [T.J.]" (Tr. 60.) According to Chisholm, Father initially withheld one of T.J.'s major medications for his cancer treatment from his foster mother for approximately two to three months, forcing her to endure "a lot of difficulties in trying to get the medicine because of the particular lab it came from and that the medication was very expensive" to ensure that T.J. did not go without his needed medication. (Tr. 89.) Father also failed to provide T.J.'s

needed medications to Mother, and there were additional concerns that Mother was not giving T.J. his medication as needed.

{¶ 11} According to Chisholm, Father was asked in February 2023 to complete a mental health evaluation due to concerns over his "inappropriate behaviors when it came to coaching [T.J.] into what to say when talking with professionals, and [F]ather's lack of understanding of how [CCDCFS] operates and concerns that were brought up." (Tr. 54.) Father initially refused to sign a release to facilitate the referral because he felt the assessment was unnecessary. Chisholm testified that Father eventually signed a release sometime in April or May 2023, and as of the June 2023 trial date, that goal remained outstanding.

{¶ 12} Chisholm explained the nature of the "coaching concern," stating that "[d]uring visits [F]ather would not allow workers to meet with [T.J.] alone. He always had to be present sitting there and [T.J.] would look to [Father] to answer questions for him instead of answering independently." (Tr. 56.) Additionally, at a visit in May 2023, Father "took [T.J.] to the restroom and told [T.J.] to inform the Judge at his [in camera] interview that he wanted to come home and stay with him." (Tr. 56.)

{¶ 13} Chisholm also expressed concern that Father was at times aggressive with her, making inappropriate comments, yelling, and recently telling her that she "better do the right thing in court today" and that she "was killing him." (Tr. 57.) She gave the following example of Father's behavior during visits:

During visits [Father] is . . . usually like whispering with [T.J.], and he'll often have him looking at his cell phone. I'm not sure if he's writing anything or anything, but from [T.J.'s] reactions, he becomes uncomfortable. He begins to stare at me. I'll ask [T.J.] if he's okay and he'll just look. He really don't respond. [Father] will always answer and say he's fine. This is his select mutism. He doesn't want to talk. [Father] always kind of like coaches [T.J.]. into saying things.

(Tr. 57.)

{¶ 14} With regard to the selective mutism, Chisholm testified that while Father claimed T.J. had selective mutism, she only observed T.J. to be less communicative in Father's presence and noted that since T.J.'s removal from Father's home, he "is a chatterbox. He talks to me freely. He is excited when I pick him up for his visits. We have no issues with talking." (Tr. 58.)

{¶ 15} Chisholm further testified that Father unilaterally chose not to visit T.J. for about four months between February and May 2023, during which time he had no contact whatsoever with T.J., and he advised that "he no longer wanted to visit with [T.J.] at this time until he was able to get services to show that he didn't have any mental health symptoms or diagnosis." (Tr. 87.) Father later claimed during his own testimony that his failure to visit was related to his own medical issues, but acknowledged that his condition did not prevent him from visiting and that he "chose not to visit" T.J. during that time. (Tr. 446.) Father also admitted that he told the agency worker that he was going to forego his visits with T.J. until he completed his psychological evaluation and that it had nothing to do with his own medical issues.

{¶ 16} Chisholm's testimony regarding Mother revealed that she completed her case plan objectives and had been sober since November 2019. Mother also had her two other children returned to her care. At the time of trial, CCDCFS was concerned over her minimization of alleged sexual abuse of T.J. by his older brother, which had resulted in pending delinquency charges against the sibling. That sibling remained in her home, and she denied that the sexual abuse of T.J. could have happened. As a result, CCDCFS felt it was not in T.J.'s best interest to return to Mother's home.

{¶ 17} Chisholm testified that during the five-month recess between the commencement of trial in June 2023 and November 2023, Mother was granted unsupervised visitation with T.J. T.J. told his foster mother that Mother asked him if the sexual abuse allegations against his older brother were true and that when he told her they were true, Mother "told [T.J.] to tell people no, that it didn't happen." (Tr. 247.) After another visit, T.J. again confided in foster mother that Mother "asked him again if his brother touched him. He said yes. She said if you tell people no, I'll take you to Disneyland." (Tr. 249.) Chisholm testified that T.J. had also confided this same information to her, which prompted CCDCFS to ask for the visits to be supervised.

{¶ 18} Mother testified that T.J. should be returned to her care, but was unsure if she would be able to coparent T.J. with Father because of their volatile history. Mother further testified that Father's refusal to abide by the visitation plan and cancel her visits that led to the filing of her motion to have T.J. removed from

his care and Father's recent allegations of sexual abuse was "just a ploy to further this case" and that she did not believe any of the sexual assault claims. (Tr. 223.)

{¶ 19} Foster mother testified that T.J. had been placed with her since July 26, 2022, and that he was initially "terrified of everything," was "[s]uper quiet," and had a fear of dogs that had been instilled in him by Father, which fear he quickly overcame after interacting with her dog. (Tr. 104.) Although she had been advised that T.J. was selectively mute, after two days T.J. "just kind of opened up real quick" with foster mother and her extended family. (Tr. 104.) Upon his arrival, T.J. would "shut down" if asked what he liked to do because he "had no idea what he liked," but now "[y]ou can't get him to stop talking." (Tr. 105.) According to foster mother, T.J. is enrolled in afterschool programs involving robotics and baseball, and "half of his first grade class came" to his recent birthday party. (Tr. 105.) Foster mother testified that she has "a very close bond" with T.J. and she has "fallen in love with [T.J.] over the last year." (Tr. 111-112.)

{¶ 20} Chisholm testified that T.J. is "very relaxed," "comfortable," and "well-bonded" with foster mother and "doing his own little thing being a normal kid." (Tr. 62-63.) T.J. told Chisholm that "he wants to keep things the way they are, which is him staying with the foster mom and then still visiting with his parents and his sister." (Tr. 64.) Chisholm further testified that T.J. is bonded with both his parents, although he is "a little more relaxed" with Mother and "he's more tense" with Father. (Tr. 94.) "He's just like kind of guarded with [Father], and he looks as though he really doesn't know what to say when [Father] is talking with him, so he

tries to just say what he believes [Father] wants to hear from him." (Tr. 94; 06/14/2023). Lastly, she testified that CCDCFS's attempts to identify alternative caregivers for T.J. were unsuccessful.

{¶ 21} Father testified that T.J.'s selective mutism diagnosis was before he received temporary custody of T.J. T.J.'s initial therapist explained to Father that selective mutism was "a trauma disorder and it's out of fear of saying stuff and getting in trouble because you say what you say." (Tr. 307.) T.J. was diagnosed with leukemia in 2020 and spent seven months in the hospital. Father testified that he stayed at the hospital with T.J. "every night, every day." (Tr. 310.) T.J. received a bone marrow transplant from his half-brother, which saved T.J.'s life, and is also the same brother who is T.J.'s alleged sexual abuser. Father kept T.J. isolated after his release from the hospital to avoid infection.

{¶ 22} According to Father, Mother was permitted to visit T.J. virtually, but never followed through with those visits. Mother resumed her visitation in July 2021, at which time T.J. would visit Mother's home for three days at a time, but problems developed in relation to Mother providing T.J.'s medication and her failure to supervise T.J. Father testified that, in February 2022, T.J. disclosed sexual abuse by his half-brother, after which Father took him to the hospital for examination. Father kept T.J. away from visiting Mother for about a month afterwards, at which time the sexual abuse allegations had been deemed "unsubstantiated." (Tr. 347.) After Father's allegations of another incident of sexual

abuse around July 2022, CCDCFS filed a motion asking to suspend unsupervised visits between T.J. and Mother.

{¶ 23} Father further testified that T.J. should be returned to his care. Father believed that both CCDCFS and the GAL had supported his desire to obtain legal custody of T.J. until the sexual abuse allegations occurred, at which time their positions toward him changed. Father acknowledged during cross-examination that there remained lead in his home that had not yet been remedied, and he acknowledged at trial that his home was not in a condition that was ready for T.J. to return to at that time. At the continuation of trial in February 2024, Father testified that his home was not ready for T.J.'s return, stating that he "would want to do more" but could not afford to. (Tr. 45.)

{¶ 24} The GAL testified that she was assigned to the case in May 2021. At that time, T.J. had been released from the hospital following his leukemia treatment and was living with Father, who was appropriately caring for T.J. According to the GAL, Mother had very limited access to T.J., at that time, because of her strained relationship with Father. The GAL acknowledged that Mother had been sober since November 2019, and had achieved reunification with her other children, but still recommended that T.J. remain in foster care, noting that "[T.J.]'s situation has not changed and my recommendation has not changed." (Tr. 67.) She further testified that T.J. was not permitted to be around his brother, who resides with Mother, because of a no-contact order issued in the brother's pending delinquency proceedings, which were not resolved at the time of trial. Based on her experience,

and considering the numerous allegations Father made against Mother and the fact that it was Father, not T.J., who provided the bulk of the information to T.J.'s therapist, the GAL viewed the case "as a custody case being fought between two parents who were fighting over custody of this child." (Tr. 94.) The GAL explained her concerns regarding Father, stating:

> There are a number. [T.J.] is not himself when he's with [Father]. He's very — it's almost like he's afraid to say what he's feeling or thinking, kind of looks at [Father] for permission to speak or for what to say.

> [Father] is very concerned about the Select Mutism. I haven't seen the Select Mutism in a long time.

> I will say that I saw some symptoms of it when I first met him, but since [T.J.] has been in temporary custody [of the agency] he is a boisterous, rambunctious, laughing, fun kid.

> He is not a kid with Select Mutism.

> I'm concerned about [Father] telling [T.J.] what to tell the Judge about where he wants to live.

> I'm concerned about [Father] not seeing the growth in his child.

> I'm concerned about the fact that [Father] took about — and I'm not gonna say it was exactly three months, but approximately three months off last year not visiting.

> I'm concerned — I don't know this firsthand, but I have been told that [Father] doesn't recognize T.J.'s dyslexia diagnosis and kind of isn't patient with him about having trouble reading.

> I think that [Father] may have some health issues and may not be able to care for [T.J.].

> It concerns me that [Father]'s home is not in a condition for [T.J.] to live in at this time.

> It concerns me that [Father] kind of put up barriers between [Mother] and [T.J.] and their ability to visit.

I mean, [Father] would unilaterally — and this was before temporary custody was awarded [to CCDCFS], so it was awhile ago, but [Father] would unilaterally decide [T.J.]'s not gonna go to [Mother's] today for the weekend.

(Tr. 96-97.)

{¶ 25} The GAL explained her concerns regarding Mother, stating that

[s]he's cancelled a lot of visits. I think that recently she's cancelled this last weekend.

I know that mom has recently gotten a second job and I think that that interferes or would interfere with her time with [T.J.].

I think that was the reason given for not being able to make the visit this last week.

It doesn't seem to be a close bond, and I'm not saying [Mother] doesn't love [T.J.] and I'm not saying [T.J.] doesn't love[Mother].

I'm just saying that the visit that I saw, [T.J.'s] little sister was there and it's been reported that in other visits [T.J.] spends most of the time with his sister, not so much with [Mother].

There's just some kind of a separation that I feel.

I don't have concerns about her sobriety. I don't have concerns about her ability to provide for the child. It's not that.

(Tr. 98-99.)

{¶ 26} The GAL further explained that "[m]y concern [with Mother] is just the relationship and how [T.J.] would do returning to the home. And then with this extra added layer of [the brother], the protection order in place, and the [sexual abuse delinquency] case being unresolved." (Tr. 104.) According to the GAL, T.J. "has been out of [Mother's] care and custody four or five years now. I just don't see that extra effort being made to kind of fix those problems." (Tr. 105.) The GAL also

expressed concern that Mother told T.J. to recant his sex abuse claims by his brother, and Mother stated that she was not open to the suggestion that her older son sexually abused T.J.

{¶ 27} The GAL was also concerned with the perceived lack of commitment to T.J.'s best interest, which was demonstrated by both parents' unwillingness to help T.J. with homework during their visitation at the library, which was a 45-minute drive from his foster home. Both Mother and Father believed that "it's the foster mom's job to do the homework. It's not their job to do the homework with him." (Tr. 100.)

{¶ 28} The GAL recommended permanent custody be granted to CCDCFS. The GAL stated that T.J.

> is thriving in his placement. He is, as I testified to, a new kid, just a completely different kid.
>
> He's happy. He's relaxed. He's doing well.
>
> He has been exposed to things he was never exposed to before, simple things like going camping and spending the night at kids houses, having other kids spend the night at his house, family parties, just all kinds of things, but he's had exposure to a pet.
>
> There's a dog that lives in the house and he's kind of a big brother because there are twin girls, I think they're 2 years old, maybe 3 years old, who live in the foster home too, and he just kind of dotes on them as though, you know, he helps to take care of them and he's very proud of that.
>
> He has friends at school.
>
> Obviously, he's recuperated from the leukemia, so that's not taking over his life as it did.

I just see him being so happy and stress-free in his current environment and I would just like to see him be able to remain there.

(Tr. 121-122.)

{¶ 29} When asked by the trial court if she believed under any circumstance that Mother and Father could coparent, the GAL responded,

No[,] . . . because they have proven that to me over the last two and a half years. . . .

[Father] unilaterally prevented [Mother] from having visits, would just not transport to visits.

[Mother] doesn't have any love loss for [Father.] They can't agree on anything.

I asked them to consider a Shared Parenting Plan [early on in the case] and I think they actually went to mediation to see if it could be worked out. That didn't work at all.

And [T.J.] is caught in the middle. He feels it from both of them.

(Tr. 129-130.)

{¶ 30} On March 28, 2024, the juvenile court terminated all parental rights, and ordered that T.J. be placed in the permanent custody of CCDCFS, finding that permanent custody is in T.J.'s best interests. The court found that T.J. has been in CCDCFS custody for 12 months or more of a consecutive 22-month period; T.J. expressed he does not trust or feel safe with either Mother or Father; T.J. has a strong bond with his foster family; T.J. had not been in Mother's custody for four years and Father's custody for one and a half years; reasonable efforts were made to prevent the removal of T.J. from the home; and T.J. cannot or should not be placed with either parent.

{¶ 31} It is from this order that both Mother and Father now appeal.

## II. Law and Analysis

### A. Temporary Custody

{¶ 32} In Father's first and second assignments of error, he challenges the juvenile court's grant of temporary custody to CCDCFS. Father contends that the court's decision to remove T.J. from his care was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 33} On July 25, 2022, the court proceeded with a hearing regarding temporary custody. The court denied the motion for predispositional temporary custody with regard to Mother and granted it to CCDCFS. The court found that "T.J.'s continued residence in or return to the home of [Father] will be contrary to T.J.'s best interest." (Order, July 25, 2022.) CCDCFS and Father's counsel filed a joint motion for stay of execution of the magistrate's order pending the filing of a motion to set aside. This motion was denied by the trial court on August 1, 2022. Father now seeks to challenge the propriety of this temporary order on appeal. The court's August 2022 ruling, however, constitutes a final appealable order from which no appeal was taken. This court has previously stated:

> "An adjudication by a juvenile court that a child is 'neglected' or 'dependent' * * * followed by a disposition awarding temporary custody to a public children services agency * * * constitutes a 'final order' within the meaning of R.C. 2505.02 and is appealable to the court of appeals * * *." *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990), syllabus. Furthermore, "an appeal of an adjudication order of abuse, dependency, or neglect of a child and the award of temporary custody to a children services agency pursuant to R.C. 2151.353(A)(2) must be filed within 30 days of the judgment entry pursuant to App.R.

4(A)." *In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607, ¶ 18. Although the parent still retains the right to appeal any award of permanent custody to a children services agency, that appeal is limited to issues that arose after the adjudication order. *Id.*

*In re S.C.*, 8th Dist. Cuyahoga No. 102611, 2015-Ohio-4766, ¶ 14; *see also In re A.N.F.*, 10th Dist. Franklin No. 17AP-905, 2018-Ohio-3689, ¶ 26.

*In re B.P.*, 2019-Ohio-2919, ¶ 9 (8th Dist.); *see also In re L.P.*, 2023-Ohio-214 (8th Dist.).

{¶ 34} Here, T.J. had previously been adjudicated neglected and was subsequently placed in the temporary care and custody of CCDCFS on August 1, 2022. As a result, Father's appeal of the temporary custody order is untimely. Nonetheless, even if we were to consider the merits of Father's first and second assignments of error, we find his sufficiency and manifest weight arguments unpersuasive for the reasons set forth in our discussion regarding permanent custody below.

{¶ 35} Accordingly, Father's first and second assignments of error are overruled.

## B. Permanent Custody

{¶ 36} In Mother's first, second, and third assignment of error, and Father's third, fourth, and fifth assignments of error, they challenge the juvenile court's award of permanent custody to CCDCFS. Essentially, both Mother and Father argue that the juvenile court's decision to terminate their respective parental rights and grant permanent custody of T.J. was not supported by sufficient evidence, is against

the manifest weight of the evidence, and CCDCFS did not make reasonable efforts to reunify the family prior to seeking permanent custody.

### 1. Standard of Review

{¶ 37} At the outset, we recognize that the right to raise one's own child is "an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This right, however, is not absolute. "'The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974).

{¶ 38} The Supreme Court of Ohio has recently provided guidance on the standard of review in permanent custody cases. The Court held:

> [T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments presented by the parties.

*In re Z.C.*, 2023-Ohio-4703, ¶ 18.

{¶ 39} Mother and Father each base their arguments on both the sufficiency-of-the-evidence and manifest-weight-of-the-evidence standards. We note that while "sufficiency and manifest weight are distinct legal concepts, a finding that a

judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re R.M.*, 2024-Ohio-1885, ¶ 46 (8th Dist.), citing *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.), citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.). Thus, we will review this matter under the manifest-weight-of-the-evidence standard.

{¶ 40} The *In re Z.C.* Court reexplained the manifest-weight-of-the-evidence standard as follows:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

## 2. Permanent Custody — R.C. 2151.414

{¶ 41} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re B.P.*, 2023-

Ohio-1377, ¶ 27 (8th Dist.), citing *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this State or another State. R.C. 2151.414(B)(1)(a)-(e).

{¶ 42} The second prong of the analysis requires the juvenile court to determine, by clear and convincing evidence, that granting permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

## a. The R.C. 2151.414(B)(1) Factors and R.C. 2151.414(E)

{¶ 43} As an initial matter, we must address both Mother and Father's arguments regarding the juvenile court's decision to grant permanent custody to CCDCFS on the basis that T.J. "has been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two-month period" as set forth in R.C. 2151.414(B)(1)(d). CCDCFS acknowledges that this finding is erroneous, but argues that this is not reversible error because the court also included appropriate findings in satisfaction of R.C. 2151.414(B)(1)(a) through its findings pursuant to R.C. 2151.414(E). We agree.

{¶ 44} In support of its position, CCDCFS relies on this court's opinion in *In re T.T.*, 2024-Ohio-2914 (8th Dist.). In this case, the juvenile court also erroneously granted permanent custody to CCDCFS on the basis set forth in R.C. 2151.414(B)(1)(d). We found that the error was harmless at best. *Id.* at ¶ 14, citing *In re R.D.W.*, 2021-Ohio-4304, ¶ 25-26 (8th Dist.). We stated, "Although the trial court made an erroneous finding, 'that does not preclude us from finding that the trial court's judgment [awarding permanent custody to the agency] is nevertheless correct.'" *Id.* at ¶ 17, quoting *In re J.T.*, 2004-Ohio-5797, ¶ 36 (2d Dist.).

{¶ 45} In reaching this conclusion, we noted that CCDCFS did not rely on R.C. 2151.414(B)(1)(d) in its motion for permanent custody. Rather, CCDCFS asserted that "'the condition listed in R.C. 2151.414(B)(1)(a) exists and that one or

more of the factors listed in R.C. 2151.414(E) apply to the parents of the [child] at issue.'" *Id.* at ¶ 15. And consistent with CCDCFS's reliance on R.C. 2151.414(B)(1)(a), the juvenile court found under R.C. 2151.414(E) that "'the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent,' and the juvenile court found multiple factors under R.C. 2151.414(E) were met, including R.C. 2151.414(E)(1) and (E)(4)." *Id.* at ¶ 16.

{¶ 46} Likewise, in the instant case, CCDCFS did not rely on R.C. 2151.414(B)(1)(d) in its motion for permanent custody. Rather, CCDCFS asserted that "the condition listed in R.C. 2151.414(B)(1)(a) exists and that one or more of the factors listed in R.C. 2151.414(E) apply to the parents of the child at issue." (CCDCFS motion, Sept. 9, 2022.) And consistent with CCDCFS's reliance on R.C. 2151.414(B)(1)(a), the juvenile court found under R.C. 2151.414(E) that "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," and the juvenile court found multiple factors under R.C. 2151.414(E) were met, including R.C. 2151.414(E)(1), (E)(4), (E)(14), (E)(15), and (E)(16). (Journal entry, Mar. 28, 2024.) Thus, just as in *In re T.T.*, we also find that while "the trial court made an erroneous finding, 'that does not preclude us from finding that the trial court's judgment [awarding permanent custody to the agency] is nevertheless correct.'" *Id.* at ¶ 17, quoting *In re J.T.* at ¶ 36.

{¶ 47} Having determined that the juvenile court made its findings under R.C. 2151.414(B)(1)(a) that "the child cannot be placed with either of the child's

parents within a reasonable time or should not be placed with the child's parents,"

we now look to R.C. 2151.414(E), which enumerates several factors for the court to

consider. *In re D.H.*, 2022-Ohio-2780, ¶ 28 (8th Dist.), citing *In re L.J.*, 2022-Ohio-

2278, ¶ 43 (8th Dist.); *see also In re L.C.*, 2022-Ohio-1592, ¶ 47 (8th Dist.). Pursuant

to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that

one or more of the (E)(1)-(16) factors exist, the court shall enter a finding that the

child cannot be placed with either parent within a reasonable time or should not be

placed with either parent.

{¶ 48} Here, the trial court found the presence of five (E) factors — (E)(1),

(E)(4), (E)(14), (E)(15), and (E)(16), which provide in pertinent part:

> If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A) (4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]
>
> . . .

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse . . . against the child or caused or allowed the child to suffer neglect . . . and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

(16) Any other factor the court considers relevant.

R.C. 2151.414(E).

### i. Failure to Remedy — R.C. 2151.414(E)(1)

**{¶ 49}** Here, the court found that Father's "home is not immediately suitable for a child. There are concerns for lead and extreme disorganization per the [GAL's] testimony." (Journal entry, Mar. 28, 2024). This finding is supported not only by the GAL's testimony, but also by Father's testimony. The GAL testified, "It concerns me that [Father's] home is not in a condition for [T.J.] to live in at this time." (Tr. 97.) Additionally, Father acknowledged during cross-examination that there was lead in his home, which had not yet been remedied, and he acknowledged at the November 2023 trial date that his home was not in a condition that was ready for T.J. to return to at that time. Father reiterated this at the continuation of trial in February 2024 that his house is not ready for T.J. to return. Given this evidence, the trial court's finding that Father had failed to remedy the conditions leading to T.J.'s removal is supported by the evidence in the record.

### ii. Lack of Commitment — R.C. 2151.414(E)(4)

{¶ 50} With this factor, the court found that Father "failed to take full advantage of visitation with the child choosing not to participate in visitation from March through June of 2023." (Journal entry, Mar. 28, 2024). This finding is supported by the record, which established that Father unilaterally chose not to visit T.J. for approximately three months, during which time he had no contact with T.J. Father advised Chisholm that "he no longer wanted to visit with [T.J.] at this time until he was able to get services to show that he didn't have any mental health symptoms or diagnosis." (Tr. 87.) Father later testified that his failure to visit was related to his own medical issues, but acknowledged that his condition did not prevent him from visiting and that he "chose not to visit" T.J. during that time. (Tr. 446.) Furthermore, the GAL noted during her testimony that "I'm concerned about the fact that [Father] took . . . approximately three months off last year not visiting." (Tr. 96.) Given this evidence, the court's finding as to lack of commitment was supported by the record.

### iii. Unwillingness to Provide for Children's Needs — R.C. 2151.414(E)(14)

{¶ 51} The court found that this factor

[a]pplies to [Mother and Father]. [Father] withheld medication he was in possession of during the child's transition to his foster caregiver. [Mother] also reported to CCDCFS that [Father] was withholding some of the child's medications from [Mother] during her visitation.

[Mother] has minimized the allegations against child's maternal sibling. When the Court ordered unsupervised visitation to take place with child, [Mother] used the time to tell the child if he stated the abuse

never happened, she would take him to Disney World. The child reported this to both his social worker and foster mother.

(Journal entry, Mar. 28, 2024.)

{¶ 52} The testimony established that T.J. had leukemia, but was in remission at the time of trial and that there were issues with getting T.J. his leukemia medications. Chisholm testified that Father refused to provide T.J.'s foster mother with T.J.'s medications and Mother did not give T.J. his medication when he was with her. Chisholm further testified that Mother minimized the sexual abuse allegations by T.J.'s sibling. Additionally, foster mother testified that Mother told T.J. to tell people that the sexual abuse did not occur. Foster mother testified, "[Mother] said if you tell people no, I'll take you to Disneyland." (Tr. 249.) Based on this evidence, the court's finding is supported by the evidence.

### iv. Abuse/Neglect and Seriousness or Likelihood of Recurrence — R.C. 2151.414(E)(15)

{¶ 53} Here, the court included a finding that "[T.J.] was adjudicated neglected in 2019. While [Mother] has maintained her sobriety, the Court has ongoing concerns for this specific child's safety in her home due to the allegations against maternal sibling and [Mother's] handling of those allegations and statements to this child regarding the allegations." (Journal entry, Mar. 28, 2024.) This finding is supported by the evidence in record that revealed that Mother asked T.J. if the sexual abuse allegations against his sibling were true, and when T.J. told her they were true, Mother "told him to tell people no, that it didn't happen." (Tr. 247.) After another visit, Mother told T.J. that if he told people no, she would take

him to Disneyland. As with the above-(E)(14) finding, the court's finding as to the threat to T.J.'s safety was also supported by the evidence.

### v. Other Relevant Factors — R.C. 2151.414(E)(16)

{¶ 54} Lastly, the court listed the following additional factors that it considered relevant:

> 1. The child is the alleged victim of sex abuse, and the maternal sibling has a current delinquency matter regarding these allegations pending in Cuyahoga County Juvenile Court. There is a no contact order in place between this sibling and the child.
>
> 2. [Mother] and [Father] have never successfully coparented the child.
>
> 3. The child does not trust or feel safe with either [Mother] or [Father].

(Journal entry, Mar. 28, 2024.)

{¶ 55} Chisholm testified that there is a no-contact order with T.J.'s older half-brother. The GAL testified that she did not "believe under any circumstance that [Mother] and [Father] could co-parent . . . [b]ecause they have proven that to me over the last two and a half years." (Tr. 129.) The GAL noted that Father "unilaterally prevented mom from having visits, would just not transport to visits. [Mother] doesn't have any love loss for [Father]. They can't agree on anything." (Tr. 129.) The GAL further testified T.J.'s wishes are to remain with his foster mother. These findings are supported by the evidence.

{¶ 56} Based on the foregoing, we find that the first prong of the permanent-custody analysis was supported by clear and convincing evidence and was not against the manifest weight of the evidence. The record clearly and convincingly supports the juvenile court's determination under R.C. 2151.414(B)(1)(a) that T.J.

cannot or should not be placed with either Mother or Father within a reasonable time.

{¶ 57} Having found that the juvenile court properly determined that at least one of the R.C. 2151.414(B)(1) factors applies by clear and convincing evidence, we must next determine whether the juvenile court appropriately found by clear and convincing evidence that granting permanent custody to CCDCFS is in T.J.'s best interest under R.C. 2151.414(D).

### b. R.C. 2151.414(D)(1) — Best Interest Determination

{¶ 58} The R.C. 2151.414(D)(1)(a)-(e) factors include (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; (b) the child's wishes, as expressed directly by the child or through the child's guardian ad litem; (c) the child's custodial history; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1), however, needs to be resolved in favor of permanent custody. *In re D.H.*, 2022-Ohio-2780, at ¶ 46, citing *In re G.W.*, 2019-Ohio-1533, ¶ 72 (8th Dist.).

**{¶ 59}** We focus our review on R.C. 2151.414(D)(1)(a) and (b).  It is clear from the record that the court considered these factors and found in favor of permanent custody.  The court found:

> [a] The child has a strong bond with his foster caregiver and foster sibling.  The child's [GAL] reports that the child has consistently been the happiest, most relaxed, and natural since being placed with his current caregiver.  While both parents love the child, the child has not been in the custody of his [Mother] or living with his maternal siblings for over four (4) years.  The child has not been in the custody of his [Father] in over one and a half (1.5) years.  There are also delinquency allegations of a sexual offense committed against the child by a maternal sibling pending.  [Mother], a younger maternal sibling, and father all participate in separate weekly supervised visitation with the child.  [Mother] and [Father] have a negative relationship and have been unable to successfully coparent the entirety of the child's life.
>
> When the child was placed with the father, the father continuously made extensive, ongoing and unsubstantiated allegations regarding sobriety and neglect against [Mother].  The father also unilaterally withheld visitation from [Mother].  While the child has had significant health challenges in his life, this did not and should not have included putting barriers in the visitation and between the relationship of the child and [Mother].  [Father] has consistently exhibited aggression towards the assigned CCDCFS caseworker, yells, and makes inappropriate comments to her; including telling the CCDCFS case worker, "she better do the right thing in Court today," and that, "I (CCDCFS social worker) was killing him."  The child reportedly apologized on behalf of his father to the CCDCFS worker.
>
> Both [Mother] and Father have used unsupervised moments with child to pressure him in regard to this matter (Father) and the associated delinquency matter for a maternal sibling where child is the alleged victim (Mother).  [Father] has had some inconsistency with choosing to participate in visitation.  He did not visit child for three (3) months between March through June of 2023.  Both the CCDCFS social worker and GAL testified that child's relationship with the parents seems distant and uncomfortable.  It was testified . . . that the child stops communicating when he is in his father's presence.  The child was diagnosed with selective mutism while in his father's care, but per the foster caregiver, CCDCFS social worker, current therapist, and guardian ad litem, the child demonstrates no symptoms of this in his

current placement.  The child is reportedly happy and boisterous.  Per the CCDCFS worker, the child would wish to continue to visit with [Mother] and [Father], but wants to live with his foster caregiver.

. . .

[b] The Court conducted an in camera with the child and is aware of the child's wishes.  The [GAL's] recommendation is for permanent custody in this matter.  The child's [GAL] testified that the child doesn't trust or feel safe with either [Mother] or [Father].

(Journal entry, Mar. 28, 2024.)

{¶ 60} Additionally, the GAL noted in her written report that T.J.'s foster caregiver has "provided him with a worry free environment, where he is permitted to be a child and not worry about adult concerns."  (GAL Report, June 12, 2023.) The GAL further noted in her report that T.J. told her that "his wishes are to remain in placement with his foster mom and to be adopted by her."  (GAL Report, June 12, 2023.)  Based on the foregoing, there is clear and convincing evidence in the record to support the court's determination that permanent custody to CCDCFS is in T.J.'s best interest.  Accordingly, we find that the court's decision to grant permanent custody to CCDCFS is not against the weight or sufficiency of the evidence as Mother and Father contend.

{¶ 61} Accordingly, Mother's first and second assignments of error and Father's third and fourth assignments of error are overruled.

## c. Reunification Efforts

{¶ 62} In Mother's third assignment of error and Father's fifth assignment of error, they each claim that the trial court erred by ordering permanent custody because CCDCFS failed to make reasonable efforts to reunify the family.

{¶ 63} "Reasonable efforts" refers to "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.'" *In re C.F.*, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case." *In re A.F.*, 2021-Ohio-4519, ¶ 35 (8th Dist.), citing *In re D.H.*, 2021-Ohio-3984, ¶ 58 (5th Dist.), citing *In the Matter of J.H.*, 2019-Ohio-5184 (5th Dist.); *In re I.H.*, 2020-Ohio-4853, ¶ 44 (6th Dist.).

{¶ 64} Under R.C. 2151.419(A)(1), a public children services agency is required to make reasonable efforts "to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." In addition, the "agency shall have the burden of proving that it has made those reasonable efforts." *Id.* This statute, however, "applies only to hearings held pursuant [to] R.C. 2151.28, division (E) of R.C. 2151.31, R.C. 2151.314, R.C. 2151.33 or R.C. 2151.353." *In re C.N.*, 2003-Ohio-2048, ¶ 37 (8th Dist.). The motion for permanent custody in this case was filed pursuant to R.C. 2151.413. Therefore, "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *In re C.F.* at ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.).

{¶ 65} The Ohio Supreme Court cautioned, however, that this does not mean that the agency is relieved of the duty to make reasonable efforts. *Id.* at ¶ 42. As the *In re C.F.* Court stated:

> At various stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification. To the extent that the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the "reasonable case planning and diligent efforts by the agency to assist the parents" when considering whether the child cannot or should not be placed with the parent within a reasonable time. However, the procedures in R.C. 2151.414 do not mandate that the court make a determination whether reasonable efforts have been made in every R.C. 2151.413 motion for permanent custody.
>
> . . .
>
> [E]xcept for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time.

*Id.* at ¶ 42-43.

{¶ 66} Here, a case plan was developed to address reunification efforts in October 2019, which neither parent objected to, nor proposed changes to its terms. An amended case plan was developed in April 2021. Again, neither parent objected to, nor proposed changes to, the terms of the amended case plan. Furthermore, throughout the proceedings CCDCFS continued to make reasonable efforts to reunify T.J. with his parents prior to the termination of parental rights. The trial court included the following findings regarding reasonable efforts in its dispositional entry placing T.J.in temporary custody with Father:

> The Court finds that [CCDCFS] has made reasonable efforts to prevent the removal of the child, to eliminate the continued removal of the child from his home, or to make it possible for the child to return home. These efforts are: parenting education classes, substance abuse assessment and treatment as recommended, mental health services and domestic violence.

(Magistrate's Decision, Dec. 2, 2019.)

{¶ 67} Thereafter, on July 25, 2022, when the court removed T.J. from Father's care and placed T.J. with CCDCFS, the court included the following findings regarding reasonable efforts:

> The Court finds that reasonable efforts were made to prevent the removal of the child from the home, to eliminate the continued removal of the child from home, or to make it possible for the child to return home. The relevant services provided by [CCDCFS] to the family of the child and reasons why those services did not prevent the removal of the child from home or enable the child to return home are as follows: chemical dependency assessment and treatment, mental health services, basic needs, and assistance in finding adequate housing.

(Order, July 25, 2022.)

{¶ 68} Additionally, when the court awarded permanent custody to CCDCFS, it found:

> The Court further finds that reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification. Relevant services provided to the family include: [Mother] was referred for substance abuse, mental health, domestic violence, and housing. [Father] was referred for mental health examination and was expected to bond with child and provide basic needs. Mother and Father did complete all case plan services. The child was referred for counseling.

(Journal entry, Mar. 28, 2024.)

{¶ 69} Thus, based on the foregoing, it is clear that CCDCFS made reasonable efforts to reunify the family during the custody proceedings prior to the termination of parental rights. *In re C.F.* at ¶ 42-43.

{¶ 70} Accordingly, Mother's third assignment of error and Father's fifth assignment of error are overruled.

## C. Ineffective Assistance of Counsel

{¶ 71} In Father's sixth assignment of error, Father argues he was prejudiced by defense counsel's failure to attack the following inaccuracy in CCDCFS's July 2022 motion for permanent custody: T.J. had been in CCDCFS "custody for 12 of the preceding twenty-two months." Father maintains that this allegation is untrue and T.J. had been in his custody for all but a few weeks following his removal from Mother's care.

{¶ 72} To establish ineffective assistance of counsel, Father must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697. Furthermore, in Ohio, every properly licensed attorney is presumed to be competent, and a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Davis*, 2021-Ohio-4015, ¶ 25 (8th Dist.), citing *State v. Black*, 2019-Ohio-4977, ¶ 35 (8th Dist.), citing *State*

*v. Smith*, 17 Ohio St.3d 98, 100 (1985). When evaluating counsel's performance on an ineffective-assistance-of-counsel claim, the court "must indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see State v. Powell*, 2019-Ohio-4345, ¶ 69 (8th Dist.), quoting *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'").

{¶ 73} In the instant case, a review of CCDCFS's motion reveals that it is based on the conditions listed at R.C. 2151.414(B)(1)(a) and 2151.414(E), not the "twelve of twenty-two months" condition listed in R.C. 2151.414(B)(1)(d), as Father contends. (CCDCFS motion, Sept. 9, 2022.) In addition, the affidavit attached in support of the motion states that "[t]he child was committed to the temporary custody of Father pursuant to an order journalized on January 3, 2020" and that "[t]he child was removed from the temporary custody of Father and placed in the emergency custody of CCDCFS pursuant to an order journalized on July 7, 2022." (CCDCFS motion, Sept. 9, 2022.) Because Father's claim is unsupported by the record, Father has failed to demonstrate that defense counsel was deficient in failing to object to the motion. Notwithstanding the court's erroneous inclusion within its entry of a "twelve of twenty two months" finding pursuant to R.C. 2151.414(B)(1)(d), which was addressed above, the trial court made the appropriate "cannot or should not be placed" finding under R.C. 2151.414 (B)(1)(a) and 2151.414(E). As a result,

Father cannot demonstrate that defense counsel's performance prejudiced Father so as to deprive him of a fair trial.

**{¶ 74}** Therefore, Father's sixth assignment of error is overruled.

**{¶ 75}** Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

SEAN C. GALLAGHER, J., CONCURS;
EMANUELLA D. GROVES, P.J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

EMANUELLA D. GROVES, P.J., DISSENTING:

**{¶ 76}** I write separately to dissent because the trial court's decision granting permanent custody to CCDCFS was not supported by the manifest weight of the evidence.

**{¶ 77}** At the outset, it is important to remember that the right to parent your children is a fundamental right. *In re C.F.*, 2007-Ohio-1104, ¶ 28 citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see In re Hayes*, 79 Ohio St.3d 46, 48 (1997) (the right to raise a child is an essential and basic civil right.). The termination of

parental rights is described as "'the family law equivalent of the death penalty in a criminal case.'" *In re M.S.*, 2015-Ohio-1847, ¶ 26 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14.   Nevertheless, the government "has broad authority to intervene to protect children from abuse and neglect." *C.F.* citing R.C. 2151.01.

{¶ 78} Efforts to protect children, should occur, "whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interest of public safety." R.C. 2151.01(A). Furthermore, when a court decides to remove a child from the home, the court must determine whether the movant has made reasonable efforts to "(a) prevent the removal of the child from the child's home; (b) eliminate the continued removal of the child from the child's home; and (c) make it possible for the child to return home."   Juv.R. 27(B)(1)(a)-(c).   "[E]xcept for some narrowly defined statutory exceptions, the State must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *C.F.*, 2007-Ohio-1104, at ¶ 43.

{¶ 79} The juvenile court's decision to remove T.J. from his Father's custody was completely unsupported by the record.  The agency's case worker supervisor, Kara Archer, testified that there was no basis for an emergency removal of T.J. from Father's custody. (Tr. 44-45.) Nevertheless, the juvenile court's magistrate ordered the emergency removal of T.J. from the home.

{¶ 80} The decision to remove T.J. from Father is concerning because it was based almost entirely on allegations that Father was difficult. The majority of the magistrate's findings were contradictory on their face or contradicted by the record. The magistrate found that T.J. was medically fragile, and yet found that T.J. had not been in school for two years and Father had "unreasonably" isolated the child from family and friends. T.J. was initially prevented from entering kindergarten because of the advent of the COVID-19 pandemic. Then T.J. was diagnosed with leukemia and was hospitalized for seven months, after which his doctors had recommended some isolation because of his compromised immune system. The court further found that Father had dangerous lead in his home. The GAL stated however that lead was an issue but that the last time she had been to the home was a year prior in May 2021, and the last time she spoke to someone on the issue was a couple of months before trial. (Tr. 48, 52.) All the other findings complained that Father withheld visits from Mother, that there were last minute unsubstantiated allegations against Mother, and that Father "may be inappropriately influencing the child." The magistrate did not find that T.J. was in danger in the home of neglect, abuse, or dependency. None of these findings warranted the removal of T.J. from the custody of a parent who loves him, and certainly the court had other means at its disposal to address Father's conduct short of removal.

{¶ 81} Nevertheless, the decision to take a child into the emergency custody of the agency is one a magistrate may make without judicial approval "if necessary to regulate the proceedings and if not dispositive of a claim or defense of a party."

Juv.R. 40(D)(2)(a)(i). Father had the option of filing a motion to set aside the order but failed to do so. *See* Juv.R. (40)(D)(2)(b). The agency is ordinarily required to file a motion requesting, at a minimum, temporary custody within 24 hours after such an emergency order. R.C. 2151.33(C)(2). The agency did not file for permanent custody until a month and a half later in September 2022. Although Father, in a joint motion with the State, filed a motion to stay the removal pending the filing of a motion to set aside the order, Father never filed the motion to set aside the order; T.J. therefore remained in emergency temporary custody of the agency until the trial court's permanent custody decision in 2024.

{¶ 82} While I agree with the majority that Father has waived his right to challenge the emergency custody order before this court, the magistrate's decision had a catastrophic effect on Father's ability to regain custody. From that point forward, Father's battle to obtain custody of his son was uphill. The magistrate's decision had the effect of identifying Father as a nuisance. This finding is reflected in the trial court's subsequent actions when one examines the requirements of permanent custody.

{¶ 83} The finding that the agency should receive permanent custody must be supported by clear and convincing evidence, i.e., a degree of proof that is more than a mere preponderance of the evidence but not of the level of certainty required for proof beyond a reasonable doubt in criminal cases. *In re Z.C.*, 2023-Ohio-4703, ¶ 7 citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Evidence that meets this standard should "'produce in the mind of the trier of facts

a firm belief or conviction as to the facts sought to be established.'" *Id.,* quoting *Ledford* at *id.*

{¶ 84} Based on a review of the record, I would find that the trial court lost its way and created a miscarriage of justice as permanent custody was against the manifest weight of the evidence.

{¶ 85} With respect to the first prong of the permanent custody analysis, under R.C. 2151.414(B)(1)(a),[5] the trial court found that T.J. could not or should not be placed with his parents due to findings in R.C. 2151.414(E)(1), (4), (14), (15), and (16). If a court finds that one or more of the factors in R.C. 2151.414(E) exist, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."

{¶ 86} With respect to R.C. 2151.414(E)(1), Father's failure to remedy, the statute requires a finding that following the child's removal and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside of the home, the parent has failed continuously and repeatedly to substantially remedy the conditions that caused the child to be placed outside the home. Preliminary, despite making this finding the trial court also found that "Mother and Father did complete all case plan objectives." The majority references the current condition of Father's

---

[5] As the majority noted the trial court improperly cited R.C. 2151.414(B)(1)(d), but the State's motion was premised on R.C. 2151.414(B)(1)(a), and the juvenile court appropriately considered the R.C. 2151.414(E) factors as required under R.C. 2151.414(B)(1)(a).

home; however, the only issue raised at the time of removal was the possibility of lead paint in Father's home. At the time of removal the agency argued against T.J.'s removal from Father's custody and there was no competent evidence that Father had failed to remediate the lead-paint issue. The majority references the GAL's concern with respect to the suitability of Father's home, but the GAL acknowledged that she had only been to Father's home once and that was at the beginning of the case in 2021. Additionally, Father testified that he had removed a lot of the lead, but removing all the lead from a home built prior to 1978 was unlikely. (Tr. 432-433.)

{¶ 87} Regarding lack of commitment, under R.C. 2151.414(E)(4), the court found that Father failed to take full advantage of visits between March and June 2023. To say that this Father, who had custody of his son for two- and one-half years through COVID and cancer showed a lack of commitment because he failed to visit, either, as he told social workers, to obtain a psychological evaluation or his own health issues, is egregiously wrong. Other than this three-month period, Father regularly visited with T.J. Weighing that factor against Father's strong support and commitment to T.J. throughout this case, his serious illness, the finding that he lacked commitment to T.J. is simply not supported by the manifest weight of the evidence.

{¶ 88} Next, the trial court found that Father was unwilling to provide for the child's needs under R.C. 2151.414(E)(16) because there was evidence that he withheld medication during the child's transition to foster care and Mother also reported Father withheld medication when she had visitation. However, T.J.'s foster

mother testified that initially there were a couple of doses of medication that were sent to Father's home. She was unaware that the medication was delivered to Father until she went to get refills. She further testified that Father did provide her with the medication after about a month. Tr. 106-107. Additionally, there was testimony that the dispute between Mother and Father regarding T.J.'s medication may have been rooted in their conflict. Tr. 73. Regardless, T.J. always had access to his medication. Tr. 89.

{¶ 89} The findings with respect to R.C. 2151.414(E)(15), did not apply to Father. Finally, the court considered other relevant factors and found that Father and Mother had never successfully coparented T.J. and that T.J. does not trust or feel safe with either parent, citing R.C. 2151.414(E)(16). While the GAL believed that the parents could not coparent, that factor would be relevant to whether the parties could engage in a shared parenting agreement. *See Earley v. Earley,* 2012-Ohio-4772, ¶ 30. By itself, it is not a basis for terminating Father's parental rights. T.J.'s alleged lack of trust in his parents was based on the GAL's statement and an in camera interview. Accordingly I will not dispute the trial court's finding that T.J. has lost trust in his parents. However, there is no evidence that T.J. ever faced harm in his Father's home. At the time of the hearing, T.J. had spent as much time in his parents' custody as he had in foster care. It is questionable whether T.J. understood his Father's actions in the context of protecting his child's health. There was certainly a solution short of permanent custody to address this concern. Based on

the foregoing, I would find the record did not support permanent custody under the first prong of the test.

{¶ 90} The second prong of the permanent custody analysis requires the court to look at the best interest of the child. I am mindful that all parental rights cases involve "the difficult balance between maintaining the biological parent-child relationship and protecting the best interests of the child." *In re M.S.*, 2015-Ohio-1847, ¶ 54 (8th Dist.). "The value of having a biological parent who cares for and loves a child and with whom the child wants to be with cannot be underestimated. . . . . Familial bonds are not easily replaced, if ever, and . . . should not be permanently severed without careful consideration of all the potential costs." *Id.*

{¶ 91} In determining the best interests of the child, the juvenile court must consider all relevant factors in R.C. 2151.414(D)(1), including (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; (b) the child's wishes, as expressed directly by the child or through the child's guardian ad litem; (c) the child's custodial history; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply.

{¶ 92} I acknowledge that this district has repeatedly found that a court only needs to find one of the best interest factors; however, this finding is a departure from the plain language of *Schaefer* that states:

> A court must conclude by clear and convincing evidence that an assignment of permanent custody is in the best interest of the child. . . . The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute.

*In re Schaefer*, 2006-Ohio-5513, ¶ 56

{¶ 93} Looking at each of the factors, beginning with the interaction of T.J. with relevant caregivers, the record does reflect that T.J. began to thrive in the foster home. While his changed demeanor would certainly be relevant in isolation, its importance is diminished when it is recognized that Father and son weathered the beginning of the COVID-19 pandemic, inability to start school, leukemia, hospitalization, and isolation. Certainly, a large part of T.J.'s changed demeanor after entering foster care is due to the changed circumstances, and T.J.'s remission from cancer and not solely Father's actions.

{¶ 94} With respect to T.J.'s wishes, he expressed to the GAL and social workers that he wanted to remain in the foster home with continued visits with his parents. In isolation, that revelation supports permanent custody. Looking at the whole picture and considering the contrast between a child who has been sick and isolated and now, upon remission, has a modicum of freedom and is exposed to new experiences, it is not surprising that T.J. would prefer the foster home. Next, I consider T.J.'s custodial history. He was removed from Mother's care in 2019 and placed with Father until July 2022. After the removal, he remained in the agency's custody until the final decision in 2024. At the time of T.J.'s removal from Father's custody, the trial court's main concern was unsupported allegations of unremedied

lead paint, Father's failure to facilitate visits with Mother, and allegations that Father was trying to gain an advantage by raising spurious allegations that would prevent T.J.'s reunification with Mother. As discussed, none of those issues warranted removal of the child let alone permanent custody.

{¶ 95} The child's need for a legally secure permanent placement and whether that placement can be granted without a grant of permanent custody is the next factor. Father successfully parented T.J. for two and a half years before he was removed from Father's care. The primary basis for removal was Father's conduct and a belief that he was attempting to gain an advantage in the custody proceedings. Even if Father was attempting to gain an advantage, that fact should not be a basis for permanent custody. Maintaining the goal of keeping the family together, the court could have granted legal custody to Father, a goal the agency supported at one point in this case. The final consideration is whether any of the factors in R.C. 2151.414(E)(7) through (11) apply, and they do not.

{¶ 96} Accordingly, the finding that permanent custody was in the best interest of the child with respect to Father was not supported by the manifest weight of the evidence.

{¶ 97} Based on the foregoing, I would sustain Father's fourth assignment of error.